## Case No. 14,814.

### UNITED STATES v. CLAYTON.

[2 Dill. 219; 10 Am. Law Reg. (N. S.) 737; 4 Chi. Leg. News, 50; 5 West. Jur. 550.]

Circuit Court, E. D. Arkansas. Oct. Term. 1871.

ELECTIONS—GOVERNOR OF STATE—"ELECTION OFFICER"—RULES FOR CONSTRUING STATUTES.

1. The governor of a state is not "an officer of election" within the meaning of section 22 of the act of congress of May 31, 1870 (16 Stat. 145), which makes it criminal for any "election officer" fraudulently to make any false certificate of the result of any congressional election.

[Approved in U. S. v. Kelsey, 42 Fed. 886.]

2. Rules by which courts arrive at the intention of the legislature in construing criminal statutes, stated and applied.

3. Statutes creating crimes will not be extended by judicial interpretation to cases not plainly and unmistakably within their terms.

[Cited in U. S. v. Whittier, Case No. 16,688; U. S. v. Reese, Id. 16,137. Approved in U. S. v. Comerford, 25 Fed. 904. Cited in U. S. v. Huggett, 40 Fed. 637; U. S. v. Garretson, 42 Fed. 25; U. S. v. Wilson, 58 Fed. 771.]

[Cited in State v. Green, 87 Mo. 585; State v. Reid (Mo. Sup.) 28 S. W. 173. Cited in brief in U. S. v. Guiteau, 1 Mackey, 505. Cited in U. S. v. Spaulding, 3 Dak. 85, 13 N. W. 539.]

4. In statutes creating and defining criminal offences, the courts will not, by construction, engraft words in one section upon those of another, unless the legislative intention be plain and clear.

5. The relations of a state to the general government, and of the governor to both, referred to as showing the improbability that congress would (if its power be conceded), provide for the trial and imprisonment of this officer for omitting or fraudulently performing election duties prescribed by state laws.

The indictment in this case was presented at the April term, 1871, and is founded upon section 22 of the act of congress of May 31, 1870 (16 Stat. 145). A demurrer thereto is filed. The indictment is, in substance, as follows: That on November 8, 1870, an election was holden under the laws of Arkansas in the several counties (naming them) constituting the Third congressional district of the state, to elect a representative in the

congress of the United States; that Thomas Boles and John Edwards were respectively candidates for that office, and voted for at said election; that abstracts duly made and certified by the county clerks of the said counties composing the congressional district, of the returns of said election in the various election districts (duly made to said county clerks by the judges and clerks of said election), showing the number of votes cast respectively for Boles and Edwards, were filed in the office of the secretary of state; that on said 8th day of November, 1870, and for four months thereafter, the defendant [Powell] Clayton, was the governor of the state of Arkansas, charged with the duty of making and granting the certificate hereinafter mentioned; that during said period one Robert J. T. White was secretary of state; that December 1, 1870, said White, in the presence of the defendant, Clayton, as governor, did duly cast up and and arrange the said votes from the said several counties so returned as aforesaid; that on February 20, 1870, the defendant, as governor, did willfully, unlawfully, and fraudulently make and grant, under the seal of state, and deliver to said Edwards, a certificate, stating therein "that it appears from the returns made to the office of the secretary of state, that at an election held, etc., John Edwards was duly elected in the Third congressional district to represent the state of Arkansas in the Forty-Second congress of the United States." The indictment then alleges that the said certificate was false and fraudulent, and that, "in truth and fact, it did not appear, at the time it was made, by and upon said returns so made as aforesaid, that said Edwards was elected; but, on the contrary, it did, then and there, as aforesaid, appear by said returns that the said Boles was duly elected by a majority of one hundred votes, all of which said Clayton well knew, contrary," etc.

The election laws of the state of Arkansas, in substance, provide that the governor shall appoint registrars of election; that the board of registrars shall appoint the judges of election, and the judges, the clerks of election. The judges certify to the number of votes given to each person which is attested by the clerks. The judges are to transmit the poll books to the county clerks "within three days after the closing of the polls." "On the fifth day after the election the county clerks are to open and compare the returns and make abstracts of the votes given for the several candidates, and send certified copies of the abstracts to the secretary of state." The act provides that "it shall be the duty of the secretary of state, in the presence of the governor, within thirty days, or sooner if all the returns are received, to cast up and arrange the votes from the several counties for the persons voted for for members of congress; and the governor shall, immediately thereafter, issue his proclamation declar-

---

1 [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

ing the person having received the highest number of votes to be duly elected to congress, and shall grant a certificate thereof, under the seal of the state, to the person so elected." Laws Ark. 1868, pp. 314, 325.

In support of the demurrer, it was argued by the defendant's counsel that the indictment is insufficient in law: (1) Because it does not allege that the defendant was an election officer. (2) Because it does not allege what the result was of the casting up and arranging of the votes by the secretary of state, and that the certificate issued to Edwards was false according to the result ascertained by the secretary of state, the only allegation in this regard being that it was false as appears by the returns on file. (3) Because, within the meaning of section 22 of the act of congress of May 31, 1870, upon which the indictment is framed, the defendant, being the governor of the state, was not an officer of the congressional election mentioned in the indictment. (4) Because it is not within the constitutional powers of congress to provide for the punishment of the defendant, the chief executive officer of the state, in respect of acts and duties performed by him as such executive under the laws of the state.

Mr. Harrington, Dist. Atty., with whom were Messrs. Whipple, Thompson, and Barnes, for the United States.

Messrs. Wilshire, Gantt, Warwick, and Yonley, for defendant.

Before DILLON, Circuit Judge, and CALDWELL, District Judge.

DILLON, Circuit Judge. The indictment against the defendant, who was at the time of issuing the certificate of election to Edwards, the governor of the state of Arkansas, is founded upon section 22 of the act of congress of May 31, 1870 (16 Stat. 145). The amendatory act of February 28, 1871 (16 Stat. 433), does not apply to the case, since the indictment is for an act committed before its passage, and is not based upon section 20, which this last-named statute amends, but alone upon section 22, abovementioned. This section, provides "that any officer of any election at which any representative or delegate in the congress of the United States shall be voted for, whether such officer of election be appointed or created by or under any law or authority of the United States, or by or under any state, territorial, district, or municipal law or authority, who shall neglect or refuse to perform any duty in regard to such election required of him by any law of the United States, or of any state or territory thereof; or violate any duty so imposed, or knowingly do any act thereby unauthorized, with intent to affect any such election, or the result thereof; or fraudulently make any false certificate of the result of such election in regard to such representative or delegate. * * * shall be

deemed guilty of a crime, and liable to prosecution and punishment therefor," by fine or imprisonment, or both.

The indictment necessarily proceeds upon the theory that the defendant, although the act charged against him was one required by the laws of the state to be done by him in the capacity of governor, was, within the meaning of the act of congress just quoted, an officer of election, and as such, issued and delivered to Edwards the certificate of election, which is alleged to be fraudulent. Accordingly, one of the counsel for the government well observed on the argument that the decisive question here was, whether the defendant, within the intention of congress, was, or was not, an election officer, and acting as such in making and delivering the election certificate set out in the indictment. If he is not an election officer, it was admitted that the indictment against him would not lie. To this fundamental inquiry, then, we first direct our attention; for, if this question be resolved against the government, that is an end of the case, and it is unnecessary to consider whether congress has the constitutional power to provide for the punishment of state officers in respect of acts performed by them as such, under state authority. And so in this event, it would be equally unnecessary to determine whether, if the defendant were an election officer, the indictment sufficiently avers it, or charges the offence with the particularity required by the rules of criminal pleading.

The act of congress, in the section under consideration, provides for the punishment of "any officer of election" who shall "fraudulently make any false certificate of the result of any election in regard to a representative" in congress. The question is one as to the meaning of the phrase "officer of election" or "election officer." What was the scope of the legislative intention? Undoubtedly, this language was designed to include, and does appropriately include, local judges and clerks of election at which a representative in congress is voted for. But did congress mean, by this language, to include the chief executive officer of a state? Did it mean to include in any case an official act of the governor of a state, and to provide for his punishment if he shall neglect or refuse to perform any duty imposed by state laws in respect to elections for congress, or shall violate any such duty? Did it mean to include by this description an official act of the governor, which in any case cannot be done until thirty days or more have elapsed since the election was holden and the polls closed, and which, in the case made by the indictment, was not done by him until nearly four months after the election had ended? Is the act of the governor of the state, in granting the certificate of election, the act of an election officer?

This is, as above observed, a question of

legislative intention. Now, in what manner do the courts ascertain the legislative will? We answer, that it is ascertained primarily and chiefly by the language the legislature has used to express its meaning. We must suppose in the enactment of statutes, particularly statutes so important as the one under consideration, that congress weighed well the words it employed. In the office of interpretation, courts, particularly in statutes that create crimes, must closely regard and even cling to the language which the legislature has selected to express its purpose. And where the words are not technical, or words of art, the presumption is a reasonable and strong one that they were used by the legislature in their ordinary, popular or general signification. Statutes enjoin obedience to their requirements, and, unless the contrary appears, it is to be taken that the legislature did not use the words in which its commands are expressed in any unusual sense. For these reasons, whose cogency is obvious, the law is settled that in construing statutes the language used is never to be lost sight of, and the presumption is that the language is used in no extraordinary sense, but in its common, every-day meaning. When courts, in construing statutes, depart from the language employed by the legislator, they incur the risk of mistaking the legislative will, or declaring it to exist where, in truth, it has never had an expression. The legitimate function of courts is to interpret the legislative will, not to supplement it, or to supply it. The judiciary must limit themselves to expounding the law; they cannot make it. It belongs only to the legislative department to create crimes and ordain punishments. Accordingly, courts in the construction of statutable offences, have always regarded it as their plain duty cautiously to keep clearly within the expressed will of the legislature, lest otherwise they shall hold an act or an omission to be a crime, and punish it, when, in fact, the legislature had never so intended. "If this rule is violated," says Chief Justice Best, "the fate of the accused person is decided by the arbitrary discretion of the judges and not by the express authority of the laws." Fletcher v. Lord Sondes, 3 Bing. 580.

The principle that the legislative intent is to be found, if possible, in the enactment itself, and that the statutes are not to be extended by construction to cases not fairly and clearly embraced in their terms, is one of great importance to the citizen. The courts have no power to create offences, but if by a latitudinarian construction they construe cases not provided for to be within legislative enactments, it is manifest that the safety and liberty of the citizen are put in peril, and that the legislative domain has been invaded. Of course, an enactment is not to be frittered away by forced constructions, by metaphysical niceties, or mere verbal and sharp criticism; nevertheless the doctrine is fundamental in English and American law, that there can be no constructive offences; that before a man can be punished his case must be plainly and unmistakably within the statute, and if there be any fair doubt whether the statute embraces it, that doubt is to be resolved in favor of the accused. These principles of law admit of no dispute, and have been often declared by the highest courts, and by no tribunal more clearly than the supreme court of the United States. U. S. v. Morris, 14 Pet. [39 U. S.] 464; U. S. v. Wiltberger, 5 Wheat. [18 U. S.] 76; U. S. v. Sheldon, 2 Wheat. [15 U. S.] 119. And see, also, Ferret v. Atwill [Case No. 4,747]; Sedg. St. & Const. Law, 324, 326, 334; 1 Bish. Cr. Law, §§ 134, 145.

In view of these acknowledged rules of law, the question occurs: Did congress mean, by the use of the words "officer of election" or "election officer," in the section of the statute on which the indictment is framed, to include the governor of a state? Is the governor an election officer? It seems to us not. These words are apt and usual words to describe the clerks and judges of the election, but not to describe the governor of a state. Such is not their ordinary or usual meaning. To make them apply to the executive of a state in respect to an act done a month or more after the election is closed would be a forced and unnatural meaning, and one which is not necessary in order to give the statute effect or operation. We hazard nothing in saying that in popular use no one would naturally infer that the words "officer of election" included the chief executive of a state.

Other considerations fortify the conclusion that congress did not intend to provide for the indictment of the governor of a state. The states are integral and indestructible parts of the general government, without which it cannot exist (Texas v. White, 7 Wall. [74 U. S.] 700), and in view of this relation, and of the high position and important relation of the executive of a state to the United States, as well as to the state itself, it would seem very improbable that congress would undertake to punish the governor for omitting or fraudulently discharging the duties enjoined by the laws of his state. The punishment by imprisonment would result in depriving the people of a state of the executive officer they had elected, and prosecutions of this kind, if authorized, could not fail frequently to lead to agitation, and disturb that harmony which should exist between the state and its people and the general government. Under the constitution (article 1, § 4), congress has the undoubted power to provide its own officers for the holding and conduct of congressional elections, and it would most probably exercise it, if it deemed it necessary, in preference to undertaking to

make or treat the governor of a state as an election officer, and to punish him through the national courts for malfeasance or nonfeasance in office. Kentucky v. Dennison, 23 How. [64 U. S.] 66. And especially would this seem to be so in view of the fact that the certificate of the governor is not binding upon congress, each house of which is, by the constitution, made the judge of the elections, returns, and qualifications of its own members. Const. art. 1, § 5.

Admitting, for the occasion, the power of congress to provide for the punishment of the executive of a state, as claimed by the prosecution, we repeat, that in view of the foregoing considerations, it seems to be improbable that it would undertake to exercise the power. At all events, it is impossible, on legal principles, that any such intention should be held to exist from the use of the general words "election officers."

We have carefully considered the very able arguments which have been addressed to us to show that the governor is embraced in the more general language of sections 19 and 20 of the same act, and that, if so, these words, supposed to include the governor, should, though omitted by the legislature, be inserted by judicial engraftment into section 22, on which the indictment is founded. In answer to the argument, we deem it necessary only further to observe that the governor is not in terms named in either of those sections; that it is far from certain that they intended to embrace any official act of this officer, and, if they did, we could not, after the judgment of the supreme court, delivered by Chief Justice Marshall, in U. S. v. Wiltberger, supra, enter upon the dangerous and unauthorized work of incorporating the provisions of one section of a law into another. We could never be sure that we did not put in what congress may have purposely left out. The bill charges no indictable offence, and the demurrer thereto must be sustained. Demurrer sustained.

As to enjoining the governor of a state by the federal courts. Murdock v. Woodson [Case No. 9,942]; Harrison v. Hadley [Id. 6,137].